**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

*Electronically Filed*

| | | |
|---|---|---|
| **FINLEY, JENNIFER,** | ) | |
| **2988 BUTTERWICK DR** | ) | |
| **CINCINNATI, OH 45251** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | **CASE NO. _____** |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **THE HEALTHCARE CONNECTION** | ) | **WITH JURY DEMAND** |
| **1401 STEFFEN AVE** | ) | |
| **CINCINNATI, OH 45215** | ) | |
| **Serve:** | ) | |
| **DOLORES J. LINDSAY** | ) | |
| **1401 STEFFEN AVE** | ) | |
| **CINCINNATI, OH 45242** | ) | |
| | ) | |
| | ) | |
| **DEFENDANT** | ) | |

**<u>COMPLAINT</u>**

For her complaint against The Healthcare Connections (THCC), Plaintiff Jennifer Finley

alleges and avers as follows:

1. Throughout the Covid-19 pandemic, the Plaintiff, Jennifer Finley

stood ready, willing, and able to take safety precautions in the workplace as required by her past

employer to prevent the spread of Covid-19 and protect her health and the health of those

1

employees with whom she worked and patients she served. The Plaintiff, however, has a religious belief that conflicts with one of her past employer's safety policies: mandatory vaccination. The Plaintiff's conflict is protected by federal and state law. Thus, this case is not a challenge to the lawfulness of the policy imposed by the Defendant, but rather an attempt to prevent unlawful discrimination based on religion in the future and to hold her past employer accountable for the harm she has suffered at its hands.

2. Federal and state law recognize an employee has a right to have religious beliefs considered when those beliefs conflict with an employer's policies, and, when possible, accommodated. The Defendant ignored federal and state law and instead applied its own set of rules when it came to evaluating religious accommodations and exemptions to its mandatory Covid-19/flu vaccination policy. Defendant then wrongfully denied Plaintiff's request by arbitrarily determining that Ms. Finley's request for a religious accommodation to the vaccine mandate did not "meet the threshold required to constitute a sincerely held religious belief under the law." As stated in a memo hand delivered to Ms. Finley dated 11/29/22. (attached here to as **Exhibit A)**. This was done in violation of Defendant's obligations under Title VII of the Civil Rights Act of 1964 ("Title VII") and Section 4112.02 of the Ohio Revised Code.

3. Defendant's actions left Ms. Finely with the impossible choice of either taking the Covid-19 and/or flu vaccine, at the expense of her religious beliefs, or losing her livelihood.

4. Under Title VII and Ohio law, if an employee seeks a religious accommodation, the employer cannot summarily impose employer-preferred workplace rules that abridge an employee's sincerely held religious beliefs. In order to protect an employee's rights, the employer must engage in a genuine, good-faith dialogue and consideration of proposed accommodations with objective evidence, and, if the employer chooses to deny employee

2

accommodations, proof that allowing the accommodations would place an undue burden on the employer. THCC's behavior was in violation of these laws.

## PARTIES

5.   The Plaintiff, Jennifer Finley, ("Plaintiff" or "Ms. Finley") is a resident of Cincinnati, Ohio. The Plaintiff had been employed by the Defendant for over 18 years. The Plaintiff has a sincere religious belief that taking a Covid-19 and flu vaccines violates her religious beliefs. The Plaintiff requested a religious accommodation from the Defendant's vaccine mandate policy ("vaccine mandate") (attached here to as **Exhibit B**.)

6.   The Defendant is incorporated in the State of Ohio, with its principal place of business at 1401 Steffen Ave. Cincinnati, OH 45242.  Actual direction, control and coordination of the Defendant's business occurs in Cincinnati, Ohio.

## JURISDICTION AND VENUE

7.   This Court has jurisdiction over the parties pursuant to 28 U.S.C. § 1331 because the Complaint seeks relief and damages under federal statute, 42 U.S.C. § 2000e, *et seq.,* and has supplemental jurisdiction over the Plaintiff's state law claim arising from the same events and occurrences under O.R.C. § 4112.02 pursuant to 42 U.S.C. § 1367.

8.   Venue is proper in this district pursuant to U.S.C. § 1391(b) because the relevant events took place in Cincinnati, Ohio, which is in the Southern District of Ohio and the Defendant's principal place of business is located therein.

9.   The Court has personal jurisdiction over the Defendant because the Defendant resides and conducts business in this judicial circuit.

10.   Plaintiff's claims for attorney's fees and costs are predicated upon Title VII, 42 U.S.C. § 2000e-5, and as allowed under state law.

3

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

11.     On or about November 30, 2021, Plaintiff timely filed charges of religious

discrimination with the Equal Employment Opportunity Commission.

12.     Her Notice of Right to Sue was issued on May 20, 2022. (attached hereto as

**Exhibit C**).

13. This Complaint is being timely filed based on the date Plaintiff received

her Notice to Right to Sue.

14. All administrative prerequisites to the filing of this suit have been meet.


**ALLEGATIONS**

15.     In March 2020, American life was irreparably changed both by Covid-

19 and by various governments and employers' response to it. Covid-19 is a virus that was first

detected in Wuhan, China, and eventually made its way to the United States of America, setting

off a chain of events that has irretrievably changed the day-to-day life of many, if not most,

Americans.

16.     In the spring of 2020, the Defendant began implementing procedures for

its workforce, including several of the following requirements for its employees: masks, social

distancing, temperature checks, COVID-19 testing, and self-quarantine. Upon information and

belief, the Defendant had substantial success reducing the risk of Covid-19 spread through these

efforts.

17.     Despite the Defendant's success in controlling the spread of Covid-19

in its workspace, the Defendant chose to implement a blanket vaccine mandate, based on reasoning unsupported by science, and has improperly implemented its vaccine mandates in violation of Title VII and O.R.C. § 4112.02.

18.     Defendant also changed their flu vaccination exemption process for employees who also requested an exemption to the Covid-19 vaccine. This resulted in employees who exerted their religious rights by requesting to be exempted from the Covid-19 vaccine being treated vastly different than employees who requested exemption to the flu vaccine but not the Covid-19 vaccine.

19.     Furthermore, the Defendant improperly terminated the Plaintiff for refusing to comply with one of its safety procedures – mandated vaccination – which has no documented positive results in preventing the transmission of Covid-19 in the workplace, ignores natural immunity, and improperly asses risk.

20.     Defendant stated in their Covid-19 Vaccination Religious Declination form (attached hereto as **Exhibit D)** "the exemption form"

> [P]lease provide a personal written and signed statement detailing the religious basis for your vaccination objection, explaining why you are requesting this religious exemption, the religious principle(s) that guide your objection to vaccination, and the religious basis that prohibits COVID-19 vaccination.

The second page required a statement from a "Religious Organization… provid[ing] a written and signed statement supporting the basis of the THCC employee's faith/beliefs, which are contrary to the practice of vaccination or specifically receipt of the COVID-19 vaccine.

21.     The information required by the Defendant to accept a religious accommodation request were in themselves in violation of EEOC guidelines. In the document posted at the

5

EEOC website titled: "What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws" (EEOC guidelines) the EEOC provides guidelines on how a religious exemption to the Covid-19 vaccine should be evaluated. In Section L.2 it states:

> Generally, under Title VII, an employer should proceed on the assumption that a request for religious accommodation is based on sincerely held religious beliefs, practices, or observances. However, if an employer **has an objective basis** for questioning either the religious nature or the sincerity of a particular belief, the employer would be justified in making a limited factual inquiry and seeking additional supporting information.[1] (emphasis added).

The Defendants requiring such an exhaustive amount of information from every employee requesting a religious accommodation to the Covid-19 and/or flu vaccine, along with a signed statement from a "Religious organization," runs afoul of the law. The multiple illegalities of the Defendant's behaviors began at the very initiation of the accommodation evaluation process.

22.     The Defendant never suggested that Ms. Finely's sincerity was in question which may have allowed for such probing and dissecting of her religious beliefs only if there was objective support.

23.     The Plaintiff followed all procedures and provided more than enough information to meet her legal obligations to have her religious accommodation granted.

24.     The Plaintiff even met the illegally intrusive requirements of the Defendant's religious accommodation policy in her declination forms which also included the statement of a religious leader despite those requirements going far beyond what an employer is allowed to seek where there is no objective basis to ask such probing religious questions. *See* **Exhibit D**

---

[1] https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#L

25.     In spite of all the efforts and information provided by Ms. Finley, the Defendant wrongfully and improperly denied the Plaintiff's request and terminated her employment in violation of state and federal law.

26.     The Defendant applied their own religious criteria in evaluating Ms. Finley's sincerely held religious beliefs. Ms. Finley was informed of the denial of her religious exemption request in the Nov. 29, 2021 letter. The conclusory statement that was given, and supported by the *Defendant's own religious evaluations*, was that "The [c]ompany does not consider your statements to meet the threshold required to constitute a sincerely held religious belief under the law." *See* **Exhibit A.** At no time did the Defendant provide how they evaluated their undefined threshold.

27.     However, the EEOC guidelines are clear. The guidelines again in section L.2 document how broadly religion is defined and therefore how broadly the protections are to be considered. The guidelines state:

> The definition of "religion" under Title VII protects both traditional and nontraditional religious beliefs, practices, or observances, including those that may be unfamiliar to employers…The sincerity of an employee's stated religious beliefs, practices, or observances is usually not in dispute. The employee's sincerity in holding a religious belief is "largely a matter of individual credibility." Section 12-I.A.2: Religious Discrimination (credibility and sincerity).[2]

28.     The Defendant did not follow those guidelines. Instead substituting their own evaluation of what is a sincerely held religious belief under law. In doing so, they violated the very well-defined religious rights of the Plaintiff.

29.     Defendants never claimed that Ms. Finley's sincerity was in question leaving the very important question: How did the Defendants determine what is required to meet their

---

[2] https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#L

threshold? One thing is certain; however, it is a vastly different threshold than what is required under law and federal guidelines. This discrepancy in requirements puts the Defendant at odds with federal and state law. Thereby making the Defendant's decision to deny Ms. Finley's religious exemption request illegal.

30.    The clearest statement that proves the Defendant's actions were in violation of Federal Law is the unambiguous statement from the EEOC guidelines from section K.12 where it states:

> Once an employer is on notice that an employee's sincerely held religious belief, practice, or observance prevents the employee from getting a COVID-19 vaccine, the employer **must** provide a reasonable accommodation unless it would pose an undue hardship." (emphasis added)

EEOC guidance explains that the definition of religion is broad and protects:

> beliefs, practices, and observances with which the employer may be unfamiliar. Therefore, the employer should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief, practice, or observance.

31.    The Defendant failed to meet the above requirements in their declaration that Ms. Finley's religious exemption request somehow failed to meet an undefined and significantly different threshold than what is defined in federal law and guidelines. They did this willfully while trampling the rights guaranteed under Title VII and specifically documented in the EEOC guidelines that are particular to religious exemptions and the Covid-19 vaccine

32.    **Exhibit D** states in unambiguous terms her religious objections, along with the support of a religious leader,

33.    Defendants additionally violated Ms. Finley's religious rights pertaining to her accommodation request to not receive the flu vaccine.

34.    Defendant had two separate forms for employees to fill out to request an exemption to the flu vaccine. One for employees who also requested an exemption to the Covid-

19 vaccine (attached hereto as **Exhibit E**) and one for those employees who did not seek an exemption to the Covid-10 vaccine. (attached hereto as **Exhibit F**).

35.     By the Defendants having two very different forms, depending on whether a religious exemption was also requested for the Covid-19 vaccine, it is by definition discrimination against those who exerted their religious rights relating to the Covid-19 vaccine.

36.     The exemption form for the flu vaccine for those employees who did not also request an exemption to the Covid-19 vaccine is very different in wording and tone than the one required to be filled out by the employees who also requested a religious exemption to the Covid-19 vaccine.

37.     Ms. Finley had been exempted from the flu vaccine for over ten years prior to the new flu vaccination exemption process.

38.     The flu exemption form for employees who were not seeking an exemption to the Covid-19 vaccine did not require a statement from a religious leader. Nor did it require check boxes to "acknowledge… the following facts" to nine loaded statements. *See* **Exhibit F**

39.     In order for an employee to request a religious exemption to only the flu vaccine, the employee merely needed to check a single box.

40.     The Plaintiff's flu vaccine exemption form was much more hostilely worded, included many more affirmations and required a religious leader to "sign off" on Ms. Finley's flu exemption request. These additional requirements are a stark example of Ms. Finley being treated differently because of her religious beliefs and how those beliefs preclude her from taking the flu vaccine.

41.     In denying Ms. Finley's flu exemption request, the Defendants, like they did in denying her religious exemption request to the Covid-19 vaccine, explained extensively how

9

they disagreed with the manner in which Ms. Finley applied and lived out her religious beliefs. *See* **Exhibit A**

42.     Ms. Finely provided her religious beliefs and how taking the covid-19 and flu vaccine violated those beliefs along with the support of the religious leader as the Defendant required.  *See Id See also* **Exhibit E.**

43.     While the Defendant takes issue with Ms. Finley's concerns about specific ingredients in the vaccines, they completely fail to address Ms. Finley's religious objections to the ingredients in the vaccines and how the vaccines, through those ingredients, are in direct conflict with her religious beliefs, and therefore, the vaccine itself.  The Defendant fails to show how Ms. Finley's beliefs are not sincerely held so that it would be against said beliefs to take the Covid-19 and flu vaccines. *See* **Exhibit A**

44.     The Defendant incorrectly concludes the case of *Farina v. Bd. Of Educ. Of the City of New York, et al.,* F.Supp.2d 503 (2000) supports of their denial of Ms. Finley's exemption request to the flu and Covid-19 vaccine. That case states that "an exemption under the law does not extend to persons whose views are founded upon medical or *purely* moral considerations, scientific, or secular theories, or philosophical and personal beliefs."  (emphasis added) *Id at 507 quoting,  Sherr v. Northport-East Northport Union Free School Dist.,* 672 F. Supp. 81,92 (E.D.N.Y. 1987).

45.     In *Farina*, the court concluded that the plaintiff's claim of religious beliefs were insincere when the court stated the claimed religious beliefs were "the product not of the plaintiffs own deeply held conviction, but rather more plausibly as expressions the plaintiffs borrowed from outside sources in their effort to obtain the exemption." *Id at 508*.

10

46.     There is no similar claim that Ms. Finley's beliefs were so formed making *Farina* irrelevant when applied to the facts of this matter. *Farina* is also not controlling law in this district.

47.     The EEOC guidelines however provide clarity that is on-point as well as applicable in this federal district, when employers are dealing with such complicated matters as what is religious vs. personal/political/philosophical, etc in Section L.2 when it states:

> Title VII does not protect social, political, or economic views or personal preferences. Thus, objections to a COVID-19 vaccination requirement that are **purely** based on social, political, or economic views or personal preferences, or any other nonreligious concerns (including about the possible effects of the vaccine), do not qualify as religious beliefs, practices, or observances under Title VII. However, overlap between a religious and political view does not place it outside the scope of Title VII's religious protections, as long as the view is part of a comprehensive religious belief system and is not simply an **isolated teaching.**
> (emphasis added)

48.     Ms. Finley's religious accommodation documents clearly state that her beliefs are not purely non-religious in nature and are in-fact mostly religious. Furthermore, her religious beliefs go beyond an isolated teaching and are an all encompassing aspect of how she lives her life. The Defendants previously made this finding when they approved her religious exemptions to the flu vaccine for over a decade.

49.     Ms. Finely clearly states religious reasons for her opposition to the Covid-19 and flu vaccines in both her submitted documents as well as the documents presented by the noted religious leader. *See* **Exhibits D and E.**

50.     Ms. Finley's religious beliefs are hers and hers alone. Regardless of whether the Defendants agree or not, there is no objective basis to believe they are insincere nor that they are not religious in nature. The Defendant never questioned Ms. Finley's sincerity and their attempt to twist her words to make them secular fail when taken on the whole when combined

11

with the statements of the religious leader. Therefore, they must be granted unless an undue burden is objectively shown. Such undue burden claim also fails as documented below.

**The Defendant pivoted from successful and proven Covid-19 mitigation practices and improperly chose mandated vaccination as its sole safety procedure upon which it predicated employment.**

A. <u>The vaccine mandate is unlawful as enforced.</u>

51. The Food and Drug Administration ("FDA") issued an Emergency Use Authorization ("EUA") for the Pfizer-BioNTech vaccine on December 1, 2020 for select populations. One week later a second EUA for the Moderna COVID-19 vaccine was issued. The FDA issued an EUA for the Johnson & Johnson COVID-19 vaccine on February 27, 2021. On August 23, 2021, the FDA issued full approval for the Pfizer-BioNTech COVID-19 vaccine marketed as Comirnaty. However, it should be noted, that the FDA has admitted the Comirnaty vaccine, which is legally distinct from the Pfizer vaccine that is currently available in the US, was not available when Ms. Finley was terminated.

52. Though the FDA has approved the use of a currently unavailable vaccine for future use, the only vaccines widely available for use in the United States are these three experimental, investigative and unlicensed drugs, all of which were either developed, tested, or produced with the use of fetal cells from aborted fetuses.

53. Since the rollout of the vaccines, and prior to Ms. Finley's termination, more and more data increasingly showed the vaccines do not prevent infection, do not prevent transmission, and do not prevent illness. Indeed, countries with the most aggressive, expansive use of the vaccines have seen record-setting infection rates and continuing high illness rates.

54. Scientists studying over 4,000 frontline workers found that between

December 2020 until April 2021, the effectiveness of the vaccines cratered from 91 percent to 66 percent. This drastic decline occurred before the Delta and Omicron variants became dominant.[3]

55.     Even more alarming, research focusing on the Pfizer vaccine's effectiveness in America shows that from December 14, 2020, until August 8, 2021, the vaccine plummeted in effectiveness, collapsing from 88 percent to 47 percent.[4]

56.     In addition, governmental authorities have revised their definition of the word "vaccine" itself to continue to label these experimental drugs with novel ingredients "vaccines" because they fail to meet the test of traditionally defined vaccines, which actually inoculated against infection and prevented transmission. None of which these vaccines can any longer claim credit for such results which reflects the fact there has never been a successful COVID-19 vaccine in history due to the viral evolution.[5]

B.     The vaccine mandate ignores natural immunity.

57.     The National Institutes of Health and other bodies have found that natural immunity to Covid-19 – that is, immunity cause by infection with Covid-19 and recovery – is incredibly strong. Specifically, antibodies against the spike protein of the Covid-19 virus remain in 98% of people who have recovered from the virus six to eight months after infection (the outer

---

[3] Ashely Fowlkes, et al., *Effectiveness of COVID-19 Vaccines in Preventing SARS-CoV-2 Infection Among Frontline Workers Before and During B.1.617.2 (Delta) Variant Predominance – Eight U.S. Locations, December 2020-August 2021,* 70 Morbidity and Mortality Weekly Report (Aug. 27, 2021) available at https://www.cdc.gov/mmwr/volumes/70/wr/mm7034e4.com.
[4] Sara Y. Tartof, et al., *Six-month Effectiveness of BNT162b2mRNA COVID-19 Vaccine in a Large US Integrated Health System: A Retrospective Cohost Study,* Lancet, 2021 Oct. 16, 398 (10309):1407-16, available at https://pubmed.ncbi.nlm.nih.gov/34619098/.
[5] Katie Carrero, *Why did the CDC change its definition for 'vaccine'? Agency explains more as skeptics lurk,* MIAMI HERALD (Sept. 27, 2021) available at https://wwww.miamiherald.com/news/coronavirus/artcle254111268.html.

limit of the study was simply because the study was done on individuals where were six to eight months out of recovery, not because immunity begins to wear off).[6]

58.    Health and Human Services' Assistant Secretary, Dr. Admiral Brett Giroir stated in August 2021, in a nationally televised interview, that "there are still no data to suggest vaccine immunity is better than natural immunity. I think both are highly protective." [7]

59.    The data out of the State of Israel underscores this point. In a paper awaiting peer review, scientists out the State of Israel report that in studying thousands of patients, those whose only source of immunity was a vaccine (in the case of Israel, the Pfizer vaccine was used) had a 5.96 to 13.06-fold increased risk of a breakthrough infection with the Delta variant of Covid-19 over those whose immunity was natural.[8]

60.    Israel is one of the most vaccinated places in the world, with close to 80% of the country having been vaccinated. Israel's bout with the Delta variant of Covid-19 has demonstrated that the Pfizer vaccine, once considered the Cadillac of the three Covid-19 vaccines, is only 64% effective at preventing symptomatic cases of Covid-19.[9] Moreover, despite Israel's high vaccination rates, Israel is becoming "the world's COVID hotspot."[10]

---

[6] NIH, *Lasting immunity found after recovery from COVID-19*, NIH (Jan. 26, 2021), available at https://www.nih.gov/news-events/nih-research-matters/lasting-immunity-found-after-recovery-covid-19.

[7] FOX NEWS, *Admiral Brett Giroir explains natural immunity to COVID-19*, Admiral Brett Giroir (Aug. 13, 2021) available at https://www.youtube.com/watch?v=O641EW4okPs.

[8] Sivan Gazit, et al., *Comparing SARS-CoV-2 Natural Immunity to Vaccine -Induced Immunity: Reinfections Versus Breakthrough Infections*, medRvix (Aug. 25, 2021), available at https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf.

[9] Aaron Blake, *Vaccine doubters' strange fixation with Israel*, WASHINGTON POST (Jul. 22, 2021) available at https://www.washingtonpost.com/politics/2021/07/19/vaccine-skeptics-zero-israel-again-some-reasons/.

[10] Conor Boyd, *Israel is not the world's Covid hot spot: Cases sours despite country's trail blazing vaccine roll-out – sparking fears other highly-vaccinated countries will be hit by another wave due to jabs' waning immunity*, DAILY MAIL (Sept. 3, 2021) available at

61.    In addition, in a recent study concerning the Omicron variant, scientists found that the variant "can evade immunity from Covid-19 more so than any other previous variants discovered during the course of the pandemic."[11] "Researchers studied over 11,000 Danish households and found that those who had the Omicron variant had a 31 percent chance of a secondary attack rate (SAR), which refers to the probability an infection occurs within a specific group like a household or close contacts."[12] Moreover, the study revealed that "vaccine effectiveness was reduced to around 40 percent against symptoms and to 80 percent against severe disease. . ."[13]

62.    The now well-known study of the effects of natural immunity in the Cleveland Clinic Health System provides yet another example of the real-world superiority of natural immunity to vaccine immunity. That study compared "breakthrough infections" (re-infection after either contracting Covid-19 or taking a vaccine) among employees of the Cleveland Clinic Health System and found that those who were previously infected and unvaccinated, 1359 people, none suffered breakthrough infections. [14]

63.    Another newly published study found that there is "no discernible

---

https://dailymail.co.uk/news/article-9951117/Isreal-worlds-covid-hotspot-0-2-population-catching-yesterday.html.

[11] Shirin Ali, New study finds omicron variant better at evading immunity, THE HILL (Jan. 3, 2021) available at https://thehill.com/changing-america/well-being/prevention-cures/588040-new-study-finds-omicron-variant-better-at citing and referencing https://www.medrxiv.org/content/10.1101/2021.12.27.21268278v1.

[12] *Id.*

[13] *Id.*

[14] Nabin K. Shrestha, et al., *Necessity of COVID-19 Vaccine in Previously Infected Individuals*, medRxiv (Jun. 19, 2021), available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v3.

relationship between percentage of population fully vaccinated and new COVID-19 cases in the last [seven] days."[15] The study found to the contrary that there was a "marginally positive association such that countries with higher percentage of population fully vaccinated have higher COVID-19 cases per [one] million people." [16] That study, which analyzed 68 different countries' vaccination rates and the rate of new Covid-19 cases, specifically referred to Israel, Portugal and Iceland, each of which is highly vaccinated and which had more cases per one million people than, for example, Vietnam and South Africa, which had around ten percent of their population fully vaccinated.[17]

64.    Several scholarly journals have also weighed in on the superiority of natural immunity to vaccine immunity. [18] Further, those who previously were infected with Covid-19 were at greater risk for bad side effects associated with the vaccine - in such cases, the vaccine might even weaken their pre-existing immunity.[19]

65.    While the vaccines have been effective at preventing serious cases and deaths, they lag far behind natural immunity in preventing symptomatic cases of Covid-19, and, therefore, transmission of Covid-19.

C.  The vaccine mandate relies on an improper assumption about the infection-fatality rate and asymptomatic spread.

---

[15] S.V. Subramanian and Aknil Kumar, Increases in COVID-19 are Unrelated to Levels of Vaccination Across 68 Countries and 2947 Counties in the United States, Eur J Epidemiol 2021 Sep 30:1-4, https://doi.org/10.1007/s10654-021-00808-7.

[16] Id.

[17] See id.

[18] Jackson S. Turner, et al., *SARS-CoV-2 Infection Indicates Long-lived Bone Marrow Plasma Cells in Humans*, Nature, 595, 421-25 (May 24, 2021), available at https://www.nature.com/articles/s41586-021-03647-4.

[19] Carmen Camara, et al., *Differential Effects of the Second SARS-CoV-2 mRNA Vaccine Dose on T Cell Immunity in Naïve and COVID-19 Recovered Individuals*, bioRxiv (Mar. 22, 2021) https://doi.org/10.1101/2021.03.22.436441, available at https://www.biorxiv.org/content/10.1101/2021.03.22.436441v1.

66.     Covid-19 presents a risk primarily to individuals aged 85 or older[20] and those with comorbidities such as hypertension and diabetes.[21]

67.     The majority of deaths associated with Covid-19 occur in those over the age of 55.[22] Within the most heavily impacted age group (age 85 and up), only 13.3% of deaths from February 2020 to February 2021 were attributed to Covid-19.[23]

68.     One of the most useful measures for calculating the risk of dying from a virus is the infection-fatality rate ("IFR"). The IFR is calculated by dividing the number of Covid-19 deaths by the number of Covid-19 infections. It attempts to answer the critical question: "If I get sick, what is the chance that I will die?" The Center for Disease Control and Prevention ("CDC") estimates the IFR for the bulk of most working-age adults is exceedingly low.[24] For adults under age 50, the CDC's "current-best estimate" is that 500 people will die per 1,000,000 infections nationwide.[25] In other words, for every one million adults infected age 50 or younger, 999,500 of them will survive Covid-19.[26]

69.     Assuming the data regarding Covid-19 infections is accurate, the

---

[20] Mayo Clinic, *COVID-19: who's at higher risk of serious symptoms* (Jan. 22, 2022) available at: https://www.mayoclinic.org/diseases-conditions.

[21] Wren Hann, et al., *Comorbidities in SARS-CoV-2 Patients: a Systematic Review and Meta-Analysis*, ASM Journals/mBio/Vol.12, No. 1 (Feb.9, 2021) https://doi.org/10.1128/mBio.03647-20, available at  https://journals.asm.org/doi/10.1128/mbio.03647-20?permantly+true&.

[22] *Id.*

[23] Heritage Foundation, *COVID-19 Deaths by age* (Feb. 17, 2021) available at https://datavisualizations.heritage.org/public-health/covid-19-deaths-by-age/.

[24] CDC, *COVID-19 Pandemic Panning Scenarios,* Centers for Disease Control and Prevention (Mar. 19, 2021) available at https://www.cdc.gov/oronavirus/2019-ncov/hcp/planning-scenerios.html.

[25] *Id.*

[26] *Id.*

CDC's numbers show Americans across the board are far more likely to die of something other than Covid-19, which casts considerable doubt on the Defendant's assertions that all employees should be vaccinated due to business necessity.[27]

70.    The Defendant already employed a very successful method of preventing Covid-19 spread from the symptomatic – self-quarantine. The Defendant's vaccine mandate only addresses one risk: asymptomatic lethal spread. The problem with the Defendant's mandate is two-fold: first, asymptomatic lethal spread is significantly less of a threat than the Defendant seems to assert,[28] and second, testing more effectively, and easily, suffices rather than forced injections of unwanted experimental, potentially life-altering drugs developed in ways that offend the Plaintiff's religious beliefs or discriminates against her because of her sincerely held religious beliefs.

71.    The Defendant uses the specter of "asymptomatic spread" – the notion that fundamentally healthy people could transmit Covid-19 to others without having any symptoms of Covid-19 – to justify its vaccine mandate. But there is little credible scientific

---

[27] Smiriti Mallapaty, *The Coronavirus Is Most Deadly If You Are Older and Male,* NATURE (Aug. 28, 2020) (demonstrating that individuals under 50 face a negligible threat of a severe medical outcome from a coronavirus infection, akin to the types of risk that most people take in everyday life, such as driving a car) available at https://www.nature.com/articles/d41586-020-02483-2.

[28] Michael A. Johansson, et al., *SARS-CoV-2 Transmission from People Without COVID-19 Symptoms,* JAMA Netw. Open, 2021; 4(1):e2035057 (Jan. 7, 2021) http://doi.10.1001/Jamanetworkopen.202.35057, available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774707. *See also* Kenneth McIntosh, et al., *COVID-19: Epidemiology, Virology, and Prevention,* WoltersKluner (Jan. 13, 2022) available at https://www.uptodate.com/contents/covid-19-epidemiology-virology-and-prevention#H3392906512.

evidence that demonstrates the phenomenon of "asymptomatic spread" poses any meaningful danger to employees or anyone else for that matter. Indeed, it is "very rare" even according to Anthony Fauci, and, at worst, poses a one-in-a-million risk of lethal spread. The Defendant's response to Covid-19 is predicated, in part, on the flawed assumption that asymptomatic individuals pose a meaningful risk of spreading disease.

72.     Evidence of transmission requires that an individual can be shown to be the source of infection for another person who then developed symptoms of a disease/illness.

73.     Basic microbiology shows that infectiousness or transmission of viruses such as Covid-19 require an active infection resulting in elevated levels of viral replication in the host and shedding of the virus.[29]

74.     Decades of research demonstrates that symptomatic people, such as those coughing, sneezing, and wheezing, are the real drivers of viral spread, a fact Dr. Anthony Fauci initially acknowledged during the early days of the pandemic when he told the press, "[E]ven if there is some asymptomatic transmission, in all the history of respiratory-born viruses of any type, asymptomatic transmission has never been the driver of outbreaks. The driver is always a symptomatic person." [30]

75.     When the viral replication process is blocked by a healthy immune

---

[29] *See generally*, Samuel Baron, et al., *Medical Microbiology* (4th ed. 1996) available at: https://www.ncbi.nlm.nih.gov/books/NBK8149/. *See also* Hitoshi Kawasuji, et al., *Transmissibility of COVID-19 depends on the viral load around onset in adult and symptomatic patients*, PLOS ONE (Dec. 9, 2020) available at https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0243597.
[30] U.S. Department of Health and Human Services, *Update on the New Coronavirus Outbreak First Identified in Wuhan, China*, Press Briefing (Jan. 28, 2020) available at https://www.youtube.com/watch?v=w6koHkBCoNQ&t=2642s

system, the virus is neutralized, preventing significant viral replication and shedding. This occurs in approximately half the people exposed to the virus. Their immune system's defenses effectively ward off Covid-19 before it can take hold and cause symptomatic disease. Research demonstrated that asymptomatic people are not the drivers of Covid-19 transmission as demonstrated in the following points.

76.    Researchers studying real-world laboratory samples of more than a quarter-million people found that even with a positive RT-PCR test, asymptomatic people have a much lower probability of being infectious.[31]

77.    A research article published in the CDC's *Emerging Infectious Diseases* journal notes that little to no transmission of Covid-19 occurred from asymptomatic people studied by research in Germany.[32] The researchers note: "The fact that we did not detect any laboratory-confirmed SARS-CoV-2 transmission from asymptomatic case-patients is in line with multiple studies . . ."[33] The lack of scientific and medical evidence surrounding asymptomatic spread led the researchers to conclude that asymptomatic spread is "unlikely to substantially spread COVID-19."[34]

78.    A review in March 2021 of all the published meta-analysis on asymptomatic transmission from Dr. John Lee, a retired British Professor of Pathology, reveals that in many cases, the same few studies have been recycled repeatedly to support the flawed

---

[31] Andreas Stang, *The performance of the SARS-CoV-2-RT-PCR test as a tool for detecting SARS-CoV-2 infection in the population* (Aug. 2021) 83 J. Infect. 2, https://doi:10.10161j.jinf.2021.05.022  available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8166461/.
[32] [32] Jennifer K. Bender, *Analysis of Asymptomatic and Presymptomatic Transmission in SARS-CoV-2 Outbreak, Germany, 2020,* 27 Emerging Infectious Diseases 4 (April 2021) available at https://www.cdc.gov/cid/article/27/4/20-4576_article.
[33] *Id.*
[34] *Id.*

proposition that those who are asymptomatic pose a real danger.[35] In the words of Allyson M. Pollock, a professor of public health at Newcastle University in the United Kingdom, "[s]earching for people who are asymptomatic yet infectious is like searching for needles that appear and reappear transiently in haystacks, particularly when rates are falling."[36]

79.     Moreover, according to FDA, there is insufficient data to determine the vaccines authorized for emergency use actually prevent asymptomatic infection or the transmission of SARS-CoV-2, the virus that causes Covid-19.[37]

80.     Recently, the CDC reported that "new scientific data" demonstrated that vaccinated people who experienced breakthrough infections carried similar viral loads to the unvaccinated (but not naturally immune), leading the CDC to infer that vaccinated people transmit the virus at concerning levels.[38]

81.     In sum, little objective evidence exists to support a finding that asymptomatic spread is a driver of Covid-19 and, therefore, poses a danger to the Defendants' workplaces. Rather, the epidemic spread of Covid-19 is propelled almost exclusively by symptomatic persons (many of whom are fully vaccinated) who can easily self-isolate or quarantine from their co-workers.

---

[35] *See* John Lee, *Asymptomatic spread: who can really spread COVID-19,* Health advisory & Recovery Team (Mar. 2021) available at https://www.hartgroup.org/wp-content/uploads/2021/03/ASYMPTOMATIC-SPREAD.pdf.

[36] Allyson M. Pollock, *Asymptomatic transmission of covid-19,* the BMJ (Dec. 21, 2020) available at https://www.bmj.com/content/371/bmj.m4851.

[37] FDA, *Pfizer-BioNTech COVID-19 Vaccine Frequently Asked Questions,* (Nov. 19, 2020) available at https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/pfizer-biontech-covid-19-vaccine-frequently-asked-questions.

[38] *See CDC reversal on indoor masking prompts experts to ask, "Where's the data?",* WASHINGTON POST (Jul. 28, 2021) available at https://www.washingtonpost.com/health/breakthrough-infections-cdc-data/2021/07/28/dcaaa6b2-efce-11eb-a452-4da5fe48582d_story.html.

82.     The government-operated Vaccine Adverse Event Reporting System ("VAERS") database is intended to function as an "early warning" system for potential health risks caused by vaccines. Presently, VAERS is broadcasting a red alert, but the Defendants are refusing to take account this important data of adverse reactions to the vaccines and instead is barreling down the tracks of forced vaccination at full steam.

83.     Recent data presents an alarming picture. As of October 7, 2022, there have been 31,470 deaths reported to VAERS from COVID-19 vaccines, compared to just 8,673 for the preceding 30 years for all other vaccines.[39] According to Josh Guetzhow, Ph.D., there are 91 times the number of deaths and 276 times the number of coagulopathy events reported after Covid-19 vaccination than after flue vaccination.[40]

84.     Moreover, new research suggests the heightened risk of adverse effects results from "preexisting immunity to SARS-CoV-2 [that] may trigger intense, albeit relatively rare, inflammatory and thrombotic reactions in previously immunized and predisposed individuals

85.     Although the number of VAERS reports is alarming in its own right, it is likely the true number of adverse effects associated with the COVID-19 vaccines far exceeds cases reported to VAERS. In 2010, a federal study commissioned by the U.S. Health and Human Services and performed by Harvard University consultants on behalf of the Agency for Health care Research and Quality ("AHRQ") found that "fewer than 1% of vaccine adverse events" are

---

[39] Josh Guetshow, *Safety Signals for COVID Vaccines are Loud and Clear. Why is Nobody Listening?* THE DEFENDER (Sept. 29, 2021) available at https://childrenshealthdefendse.org/defender/safety-signals-covid-vaccines-full-transparency-cdc-fda/.
[40] *Id.*

ever reported to VAERS.[41] Thus, it is likely scores of adverse events associated with the COVID-19 vaccines, including deaths, go unreported.

86.     It is not just VAERS that is broadcasting a red alert. On October 1, 2021, the European Union's drug regulator, the European Medicines Agency ("EMA"), identified a new possible link between rare cases of blood clotting in deep veins with Johnson & Johnson's Covid-19 vaccine.[42] The EMA said the new, possibly life-threatening clotting condition known as venous thromboembolism ("VTE") should be included on the Johnson & Johnson product label as a possible side-effect of the shot.[43]

87.     What is more, the Moderna and Pfizer vaccines are made with polyethylene glycol ("PEG") and Johnson & Johnson uses a similarly problematic ingredient: polysorbate.[44] PEG has been linked to anaphylaxis in numerous recipients of the vaccine. PEG is the delivery mechanism to the cells that keeps the mRNA from dispersing and not reaching its intended target. PEG performs its intended use. Unfortunately, about 70% of the U.S. population is slightly to somewhat allergic to PEG. The National Institute of Health ("NHI") recently began

---

[41] Ross Lazerus, et al. *Electronic Support for Public Health – Vaccine Adverse Event Reporting System (ESP:VAERS),* Agency for Healthcare Research and Quality (Sept. 30, 2010) available at https://digital.ahrq.gov/sites/default/files/docs/publication/r18hs017045-lazarus-final-report-2011.pdf.

[42] Reuters, EU finds J&J COVID shot possibly linked to another rare clotting condition, REUTERS (Oct. 1, 2021) available at https://www.reuters.com/business/healthcare-pharmaceuticals/eu-finds-jj-covid-shot-possibly-linked-another-rare-clotting-condition-2021-10-01/.

[43] *Id.*

[44] CDC, *COVID-19 Vaccines for People with Allergies* (Dec. 14, 2021) available at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/specific-groups/allergies.html.

a clinical trial of "systematic allergic reaction to the Moderna or Pfizer-BioNTech COVID-19 vaccines" due to the recipients of those vaccines experiencing anaphylaxis.[45]

88.     According to the CDC, individuals who are allergic to PEG should not take the Moderna or Pfizer vaccines, and those who are allergic to polysorbate should not take the Johnson & Johnson vaccine.[46]

89.     Despite this known risk, the Defendant is not offering PEG allergy testing pre-vaccination and are not offering any indemnity or disability coverage from any of the known and potential adverse effects of the COVID-19 vaccines.

90.     To summarize, the potential adverse effects Plaintiff faced in being coerced to receive the Covid-19 vaccines pursuant to the Defendant's vaccine mandate is not theoretical, hypothetical or academic – they are very real and have real victims. Given the alarming reports of adverse side-effects associated with the COVID-19 vaccines, subjecting Plaintiff to vaccination exposes them to a variety of health risks ranging from headaches and blood clots to death.

### The Defendant improperly refused to grant the Plaintiff's religious exemption in violation of Title VII and O.R.C. § 4112.12

A.   The Defendant's improper conduct regarding the vaccine mandate policy and procedures and its communications with the Plaintiff regarding her request for a religious exemption.

91.     The Defendant announced Covid-19 vaccination policy and procedures to

"maintain a workplace that is free of known hazards" See **Exhibit B.** This claim fails on its face

---

[45] NIH, *NIH begins study of allergic reactions to Moderna, Pfizer-BioNTech COVID-19 vaccines* (Apr. 7, 2021) available at https://www.nih.gov/news-events/news-releases/nih-begins-study-allergic-reactions-moderna-pfizer-biontech-covid-19-vaccines.
[46] *See id.* at note 43.

as the head of the CDC Rochelle Walensky stated on August 6, 2021 on CNN when referring to the Covid-19 vaccines ability to fight Covid-19 the vaccines: "...what they can't do anymore is prevent transmission."[47]

92.     The Defendant further claimed that "compliance with mandatory COVID-19 vaccination is now required of the Company, and its employees, by and through the Omnibus COVID-19 Health Care Staff Vaccination published by the Centers for Medicare and Medicaid Services (CMS) on November 5, 2021." See **Appendix A.**

93.     The CMS rule referenced by the Defendants however provides for religious exemptions and requires CMS funding recipients to implement vaccine accommodations in accordance with federal law. (Attached hereto as **Exhibit G**). The CMS rule states: "In implementing the COVID-19 vaccination policies and procedures required by this IFC, however, employers **must** comply with applicable Federal anti-discrimination laws and civil rights protections. [Which] includes Title VII of the Civil Rights Act of 1964."[48] (emphasis added). The American Hospital Association further provided guidance of the CMS rule stating, "The rule **requires** health care facilities to allow for exemptions to staff with recognized medical conditions or religious beliefs, observances or practices." (emphasis added). "The rule requires health care facilities to allow for exemptions to staff with recognized medical conditions or religious beliefs, observances or practices. Facilities must establish a process for staff to request either exemption and **ensure that the requests are appropriately documented and evaluated."[49]** (emphasis added) (Attached here to as **Exhibit H**)

---

[47] https://edition.cnn.com/us/live-news/coronavirus-pandemic-vaccine-updates-08-06-21/h_61de1502e86060f5faf4477339928e33
[48] 86 FR 61555, 61568
[49] https://www.aha.org/special-bulletin/2021-11-04-cms-issues-interim-final-rule-requiring-mandatory-covid-19-vaccinations

94.     The Defendant claims that following the CMS guidelines is a blanket justification for flat denial of Ms. Finley's religious exemption. However, this is not the case.

95.     By the Defendants not following federal guidelines, and instead substituting their own evaluation and threshold requirements, instead of the appropriate evaluation as documented throughout this complaint, they violated the very rule they used to justify terminating Ms. Finley.

96.     Upon information and belief, the Defendant never planned to follow federal or state law requirements, discussed *infra*, that reasonable accommodations must be made for the religious observances of its employees, short of undue hardship.

97.     Upon information and belief, the Defendant denied all requests for religious accommodations.

98.     Plaintiff objects to receiving the Covid-19 and flu vaccines because she is a Christian, her body is the temple of the Holy Spirit and, as a Christian, she is compelled to protect her body from defilement. Insofar as the Covid-19 and flu vaccines also contain neurotoxins, hazardous substances, attenuated virus, animal parts, foreign DNA, albumin from human blood, carcinogens and chemical wastes that a proven harmful to the human body, the Plaintiff finds the taking of the vaccine to be in direct conflict with her Christian duty to protect her body as the temple of the Holy Spirit.

B.  Federal law and State law prohibiting religious discrimination.

99.     Title VII prohibits the Defendant from discriminating against employees based on their religion. This "include[s] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

26

100.     Title VII "imposes upon employers a 'statutory obligation to make reasonable accommodation for the religious observances of its employees, short of undue hardship." *Reed v. International Union, United Automobile, Aerospace and Agricultural Implement w\Workers of America*, 569 F.3d 576, 579 (6th Cir. 2009).

101.     A prima facie case of religious discrimination based on a failure to accommodate requires a plaintiff to show "(1) a bona fide religious practice conflicts with an employment requirement, (2) he or she brought the practice to the [defendant's] attention, and (3) the religious practice was the basis for the adverse employment decision." *E.E.O.C. v. Union Independiente de la Autoridad de Acuductos y Alcantarillados de Puerto Rica*, 279 F.3d 49, 55 (1st Cir. 2002). *See also Reed*, 569 F. 3d at 579 (6th Cir. 2009); *Smith v. Pyro Mining Co.,* 827 F.2d 1081 (6th Cir. 1987) A "bona fide religious practice" or belief is one that is "religious and sincerely held." *Id.* Title VII's definition of religion includes "all aspects of religious observance and practice, as well as belief." *Id.,* citing 42 U.S.C. § 2000e(j). Further 29 C.F.R. § 1605.1 states that religious practices include "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious values." Section 2000e(j) "leaves little room for a party to challenge the religious nature of an employee's professed beliefs." *Union Independiente.* Religious beliefs are not required to be "acceptable, logical, consistent, or comprehensible to others," and that interfaith differences as to what is scripturally acceptable are "not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences." *Id.*

102.     Once an employee has made out a prima facie case of discrimination, the employer must show that it offered a reasonable accommodation, or that reasonable

27

accommodation would be an undue burden. *Stanley v. Lawson Co.,* 993 F. Supp. 1084 (N.D. Ohio 1997).

103.     Defendant provide a conclusory claim *arguendo*, without any evidentiary support, that if Ms. Finley's religious accommodation satisfied federal requirements, then her exemption request would still be denied because, "such accommodation continues to create an undue hardship for the Company as it continues to directly threaten the Company's employees, patients, and visitors with infection of COVID-19 and/or Influenza as a result of your lack of protection from spreading the virus." See **Exhibit A**

104.     This unsupported statement is the exact hypothetical hardship case law and EEOC guidelines document cannot be used to justify a denial of religious rights. Not only do we know this is merely a hypothetical burden, even if repeated over and over (without scientific support) by "experts," we also know this to be directly contradicted Walensky as noted above.

105.     "An employer must . . . present evidence of undue hardship" and not "rely merely on speculation," *Smith v. Pyro Min. Co.,* 827 F.2d 1081, 1085-86 (6th Cir. 1987), and the lack of substantive content in the Defendant's justification here demonstrates that the Defendant failed to show undue hardship.

106.     Merely stating that there is increased risk to the workplace and employee safety without explaining why and without providing evidentiary support cannot be sufficient to meet the Defendant's obligation under Title VII to establish undue hardship. Establishing "undue hardship" requires assessment of actual circumstances at the employer's place of business and of proposed and potential accommodations, and the Defendant's rote justification demonstrates that the Defendant did not do the work of assessing undue hardship. *See id.*

28

107.    Undue hardship analysis must start with an analysis of proposed accommodations. The Defendant did not identify potential accommodations. Therefore, the Defendant did not reach the first step of analyzing accommodations. An employer violates Title VII if it fails to attempt as accommodation after accommodation is requested. *EEOC v. Arlington Transit Mix, Inc.,* 957 F.2d 219, 222 (6th Cir. 1991) ("[a]fter failing to pursue [a voluntary waiver of seniority rights] or any other reasonable accommodation, the company is in no position to argue that is was unable to accommodate reasonably [plaintiff's] religious needs without undue hardship."); *EEOC v. Ithaca Indus., Inc.,* 849 F.2d 116 (4th Cir. 1988) *cert denied* 488 U.S. 924 (1988) (same).

108.    An employer must demonstrate attempted accommodation before it claims undue hardship as a defense. *See, e.g., Redmond v. GAF Corp.,* 574 F.2d 897, 901-02 (7th Cir. 1978); *Shaffeld v. Northrop Worldwide Aircraft Serv., Inc.,* 373 F. Supp. 937, 944 (M.D. Ala. 1974). The Defendant's' justification for denying the Plaintiff's requests for religious exemptions demonstrates that it did not consider potential accommodations.

109.    Moreover, the Defendant clearly could have considered accommodations as dictated by the EEOC. In the EEOC Covid-19 guidelines, they provide "examples of reasonable accommodations or modifications that employers may have to provide to employees who do not get vaccinated due to disability; religious beliefs, practices, or observance; or pregnancy." Reasonable accommodations the EEOC has identified as potentially not imposing an undue hardship on the employer include requiring the unvaccinated employee entering the workplace to:

(1) wear a face mask,

(2) work at a social distance,

(3) work a modified shift.

(4) get periodic tests for COVID-19,

(5) be given the opportunity to telework, or

(6) accept a reassignment.

*See* EEOC Covid-19 Guidance, K.2.

110. The Plaintiff would have willingly complied with any of these accommodations.

111. Beginning in March 2020, the Defendant had the opportunity to test many relevant accommodations for its employees, including daily assessments of personal health and potential exposure, availability of targeted Covid-19 testing, protocols requiring non-work when symptomatic or potentially exposed to Covid-19, contact tracing, handwashing and hygiene, and the use of PPE.

112. Such accommodations are understood to have prevented any substantial or material transmission of Covid-19 when used.

113. In addition, other accommodations are potentially available. For instance, the EEOC has specifically identified testing of employees before they enter the workplace. The EEOC COVID-19 Guidance states, "an employer may choose to administer COVID-19 testing to employees before initially permitting them to enter the workplace and/or periodically to determine if their presence in the workplace poses a direct threat to others." *EEOC COVID-19 Guidance*, A.6.

114. The Defendant's vaccine mandate provided employees, in theory but not in practice, the illusory ability to obtain a religious exemption from the vaccine mandate.

115. The Defendant denied the Plaintiff's request for religious

accommodation with the following claim: "the Company does not consider your statements to meet the threshold required to constitute a sincerely held religious belief under the law." *See* **Exhibit A.**

116. With this conclusion, there is no way to concluded whether her beliefs were determined to not be religious in nature, or sincerely held, or some other Defendant generated evaluation. However, what we do know, is that a fair reading of her exemption request easily meets the sincerely held religious beliefs under the federal law as defined by the EEOC and federal law as quoted above.

117. The Defendant made no attempt to accommodate the Plaintiff's request for religious exemption, even though she was willing to comply with other safety precautions.

118. The Defendant made no showing, nor ever even attempted to support, that providing the Plaintiff the requested exemption was an undue burden.

119. The Defendant did not engage the Plaintiff in a give and take discussion about potential accommodations. Plaintiff's willingness to comply with other safety measures were ignored.

120. It is well established that Title VII and O.R.C. § 4112 "have the same evidentiary standards and general analysis." *Gibbons v. Bair Foundation,* No. 1:04CV2018, 2007 WL 582314, at *4-5 (N.D. Ohio Feb. 20, 2007) citing *Greene v. St. Elizabeth Hosp. Med. Ctr.,* 134 F.3d 371, 1998 WL 13410, at *5 (6th Cir. 1998).

121. Given these facts, the Defendant's vaccination policy is vastly overreaching and unnecessarily violated federal and state law.

## COUNTS

### COUNT ONE

**Violation of Title VII, 42 U.S.C. § 2000e, *et seq.***
**Religious Discrimination-Failure to Accommodate**

122.    Plaintiff restates the foregoing paragraphs as if set forth fully herein.

123.    At all times relevant, Plaintiff was Defendant's "employee" within the meaning of 42 U.S.C. § 2000e(f).

124.    At all times relevant, the Defendant was Plaintiff's "employer" within the meaning of 42 U.S.C. § 2000e(b).

125.    Plaintiff holds sincere religious beliefs that preclude her from receiving a Covid-19 and flu vaccine.

126.    Plaintiff informed her employer, the Defendant, of those beliefs and requested religious accommodations from the Defendant's vaccine mandate.

127.    The Defendant refused to engage in a meaningful interactive process with the Plaintiff regarding her religious accommodation request and instead only responded to Plaintiff with unsupported legal findings and hypothetical claims. The Defendant failed to provide the Plaintiff with reasonable accommodations for her religious belief, instead terminating her for failing to violate her sincerely held beliefs and obtain a vaccination.

128.    The Defendant thereby discriminated again the Plaintiff because of her religious beliefs.

129.    By failing to engage in the interactive process or offer any reasonable accommodation, the Defendant's discriminatory actions were intentional and/or reckless and in violation of Title VII.

130.    It is reasonable to infer from the totality of the circumstances that

Defendant did not bother engaging in an interactive process with those seeking religious exemptions because the Defendant intended to discriminate against those seeking religious exemptions and never intended to provide them with a reasonable accommodation.

131.     The Defendant illegally and improperly did not identify potential accommodations as required by state and Federal law. The Defendant cannot assert the defense of undue hardship because it did not carry the burden required to do so. And *arguendo*, the Plaintiff effectively rebuts any claim of undue burden above.

132.     By discriminating against Plaintiff, because of her sincerely held religious beliefs, in their decision to deny Plaintiff's legitimate religious exemptions, the Defendant violated Title VII. And this violation has harmed and continues to harm Plaintiff.

133.     Due to the Defendant's improper, willful, intentional, and unlawful Actions, and the subsequent harm suffered by the Plaintiff, the Plaintiff asks the Court for the relief requested in her Prayer for Relief.

## COUNT TWO

### Violation of O.R.C. § 4112, *et seq.*,
### Religious Discrimination-Failure to Accommodate

134.     Plaintiff restates the foregoing paragraphs as if set forth fully herein.

135.     Plaintiff holds sincere religious beliefs that preclude her from receiving a COVID-19 vaccine.

136.     Plaintiff informed her employer, the Defendant, of those beliefs and requested religious accommodations from the Defendant's vaccine mandate.

137.     The Defendant refused to engage in a meaningful interactive process with the Plaintiff regarding her religious accommodation request and instead only responded to Plaintiff with unsupported legal findings and hypothetical claims. The Defendant failed to

provide the Plaintiff with reasonable accommodations for her religious belief, instead terminating her for failing to violate her sincerely held beliefs and obtain a vaccination.

138.    The Defendant thereby discriminated again the Plaintiff because of her religious beliefs.

139.    By failing to engage in the interactive processor offer any reasonable accommodation, the Defendant's discriminatory actions were intentional and/or reckless and in violation of O.R.C. § 4112, *et seq.*

140.    It is reasonable to infer from the totality of the circumstances that Defendant did not bother engaging in an interactive process with those seeking religious exemptions because the Defendant intended to discriminate against those seeking religious exemptions and never intended to provide them with a reasonable accommodation.

141.    The Defendant illegally and improperly did not identify potential accommodations as required by state and Federal law. The Defendant cannot assert the defense of undue hardship because it did not assert or show undue hardship in declining to accommodate the Plaintiff's sincerely held religious beliefs and no undue burden exists here regardless.

142.    By discriminating against Plaintiff, because of her sincerely held religious beliefs, in their decision to deny Plaintiff's legitimate religious exemption, the Defendant violated O.R.C. § 4112, *et seq.* And this violation has harmed and continues to harm Plaintiff.

143.    Due to the Defendant's improper and willful, intentional and unlawful actions, conducted with malice and aggregated and egregious fraud, and the subsequent harm suffered by the Plaintiff, the Plaintiff asks the Court for the relief requested in her Prayer for Relief.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the following relief:

A. Payment for all economic damages, including, but not limited to, back pay, front pay and benefit in amounts to be determined at trial;

B. Compensatory and consequential damages, and all non-economic damages, including for emotional duress;

C. Punitive damages;

D. Statutory damages;

E. Pre-judgment and post-judgment interest at the highest lawful rate;

F. An award of reasonable attorneys' fees, costs and expenses of all litigation to the extent allowable under federal and state law;

G. Trial by jury on all triable issues; and

H. Such other relief as the Court deems just and proper.

## **JURY TRIAL DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

*/s/Glenn Feagan*_____
Glenn Feagan (Bar No. 041520)
Deters Law
5247 Madison Pike
Independence, KY 41051
Phone. (859) 363-1900
gfeagan@feaganlaw.com